Good morning. We have four appeals that are scheduled for oral argument this morning. The first is the United States of America v. Maurice Kent. Adam Haynes here for the appellant. Kent, Bethany Rupert is here for the United States, and Mr. Haynes, you're busy this week. Back before the court. You may begin your argument. I represent Maurice Kent in this appeal. This court will review confirmation of all the claims in no vote and is subject to constitutional harmless error analysis under Chapman v. California. I do want to take this opportunity first to correct a misstatement in my brief, which is in my briefing I had said that there was no limiting instruction given. That is factually incorrect. It was actually given on Monday. Testimony of the preliminary hearing was given on a Thursday afternoon. The limiting instruction given Monday and then was also given as part of the final charge of the court. So I want to thank my friends at the U.S. Attorney's Office for helping me recognize my misstatement in my brief. And so I wanted to make sure that that was clear from the beginning. Thanks for pointing that out. Your Honors, the statements that are at issue here were statements made by Qualife Rhodes immediately after the shooting at the Club Medusa, literally hours thereof. The district court took into consideration how prejudicial this was and attempted to do essentially a modified Bruton because it's not technically a Bruton situation because Mr. Kent was the only defendant there. However, these statements were part of Mr. Kent's preliminary hearing on the charges that made up the Club Medusa shooting, which in this indictment, in the federal indictment, were counts two through six. They also were part of the underlying RICO conspiracy. Well, how about the fact that Judge Thrash went to great lengths to ensure that Mr. Kent's Sixth Amendment confrontation rights were not violated by giving a limiting instruction, number one, and redacting the statement in order to avoid the Sixth Amendment problem? In this case, it was Judge Boulay. It was Boulay? Okay. And Judge Boulay was clearly troubled by it because he granted my motion in part and denied it in part. But what the line of cases from Bruton, Richardson, Gray all prohibit is kind of a direct implication of who the other person is. We saw recently, and I'm going to mispronounce the name, Samia, that the Supreme Court refused to extend Bruton any further, but in this case, what you had is, for lack of a better way of putting it, a preliminary hearing on the charges that wound up being counts two through six on the federal indictment. And as part of that, that wove into this government's theory of the RICO. So your argument is that the statement wasn't redacted enough that the jury could infer that Kent was the shooter from? Absolutely. I mean, I thought this was a hearsay objection. Didn't you object on the basis of hearsay? Right. So, I mean, but the competition clause only, I mean, the way I understood it, correct me if I'm wrong, but if a statement is admitted not for the truth of the matter asserted, then it's not hearsay and there's not a competition clause problem? Well, so, yes and no. Okay. The government cites, too, I believe it's Rivera, which holds that very thing. But the statements in Rivera were of a fundamentally different kind of nature. Well, but does it matter? Absolutely. Okay. So let's say we had a hearsay statement, and even in Rivera. Well, it's not hearsay, that's the point, because it's admitted for the truth of the matter, not the truth of the matter asserted. But even in Rivera, Rivera noted that there were four statements, three of which were clearly not hearsay, one of which was, for example, excluding a third party from being involved in the case. But there was one statement that was hearsay, but based upon the facts of that particular case, the court found there that it was harmless error. We submit that this is far more and more likely like the Arboles, and I, again, apologize for the name, where you have a custodial statement made to police that is part of a preliminary hearing on charges that are the same act of, that are part of the charges in the federal indictment, so that it is clearly testimonial hearsay. Well, yeah, but I mean, so that was not, was that a case where the statement was not submitted for the truth of the matter asserted, but for some other purpose? No, the Arboles, the government attempted to, exactly, submit it for, not for the truth of the matter asserted, to show what the subsequent conduct of the government agent was. Yeah, but didn't we say there, though, that, and I mean, I agree that that's your best case, but didn't we say there that there really wasn't any need to, the government really wasn't trying to prove anything with this idea that it was submitted for, not for the truth of the matter asserted? What was really going on there is that the government was admitting it for the truth of the matter asserted. And we submit, Your Honor, that's exactly what happened in this case. Yeah, so here, though, I mean, here's the sort of overall issue I have with your position, is that the government's argument here was that the reason the defendant killed the victim was because the victim testified against the defendant. How could the government make that motive argument without having someone explain that the victim testified against the defendant? It's a little bit more nuanced than that, Your Honor, and let me explain. There is no evidence, no evidence anywhere in the record that Maurice. Right, his gang. Right, his gang, yeah. Right, or he knew that the gang was doing the stupidity that they wound up doing. But I agree with you from the RICO perspective, that was particularly important. I believe the prosecutor called it key and central to her case. Well, let's just take the RICO element out of it. Let's just assume it's a straight up murder case where I testify against somebody and they kill me. How could the government prosecute the person who killed me without getting, without explaining to the jury he testified against him, that's why he killed him? There's a second exception to the hearsay statute where you forfeit your right, forfeit by wrongdoing. And that's what I initially thought that the government was planning on doing with this. But then when we got to trial and it was answering the motion in limine, they asserted that it wasn't for the truth of the matter asserted, but rather for the. To show the effect on the hearer. Yeah. And so this case is a little bit different than some of those others in that what we have is a statement to police during an interrogation. It is the heart of what a testimonial is even from back in Crawford. And I would submit to the court that this is testimonial hearsay that I could not possibly have prosecuted. So how is it testimonial hearsay? I mean, I think you're, it sounds like we agree that to fall under this Arbelez case, you really need to establish that what the government did here was admit this for the truth of the matter asserted. But given that the district court instructed the jury not to consider it for the truth of the matter asserted, and given that, you know, there's an obvious, unlike in Arbelez, I think there's an obvious reason that the government needed to get it in to show the effect on the listener and his motive for, or his gang's motive. How do you show that? How do you show that? I'm trying to make sure that I understand the court's question. Yes, I mean, so let's just talk about the instruction. I mean, if you need to show that this was admitted for the truth of the matter asserted, given that the district court said don't consider it for the truth of the matter asserted, how can you show that? Well, part of this court's review is de novo. And so the court can look at what the prosecution actually did, which is that the theme of snitching was throughout this. Every single cooperating witness, many of the law enforcement witnesses were asked about snitching. The only snitching that was discussed by the government was Qualife Road's statement to police the night of the Club Medusa shooting. So we submit that that is not, that you can put lipstick on this particular pig and say it wasn't for the truth of the matter asserted. But then when you continually ask each witness that you have, gang members who testified, and then in your closing argument ask the jury to look at this particular statement at the preliminary hearing. And there is a, in particular, the prosecutor says, and to avoid any speculation about what did the defendant and those people in the courtroom, what did they think the evidence was against the defendant? Well, let me ask you this now. There was a lot of other evidence that was admitted at the trial that Kent was the Medusa shooter. His girlfriend, Charne Darden, testified. He jumped in her car after he was wounded. He had the gun. He was still shooting. Kent took the stand himself. He testified. Someone else gave him the gun. It was what, a switcheroo? He took the stand, testified. The jury didn't believe him. Given all that, if there was an error here, why isn't the error harmless? Well, Your Honor, a couple of things. Even Judge Boulay, during the sentencing, refused to give him an obstruction enhancement, in part because his testimony could have been 100% true and it wouldn't have made any difference in that he would have essentially admitted his liability as an aidant and a better under those. I am not going to sit here and tell the court that I have a strong argument on harmless error because I don't. But this is what, remember, this is a constitutional harmless error. So it's a higher burden. And this case demonstrates where each witness, each cooperating witness, was asked about this backdoor to this testimony. And then the prosecutor, during their closing argument, asked the jury to specifically look at it. So we would submit that this court can't say, beyond a reasonable doubt, that it did not sway the jury in this matter. All right. Thank you. Thank you. Mr. Haynes, we'll hear from the government. Ms. Rupert. Good morning, Your Honors. Bethany Rupert for the United States. May it please the Court. The defendant challenges the district court's admission of evidence that his fellow gang member, Qualief Rhodes, snitched on him to the police after a shooting in May of 2017. That evidence, statements made by a detective in which he summarized what Mr. Rhodes said, was heard by the defendant and those gang members in the courtroom that day. And as a result, Mr. Rhodes was murdered for his snitching. The district court's decision to admit these statements should be affirmed, as the purpose of providing them to the jury was to show only the effect on the listeners, specifically to show the effect on the defendant and the other gang members in the courtroom. And that effect was to put into motion a plan to kill Mr. Rhodes. Because these statements were non-hearsay, they don't raise any confrontation cause concerns. Of course, the defendant is arguing today that these statements were hearsay, that the government intended to bring these statements in for their truth. But that's directly contrary to this court's binding precedent. Whether the effect is on an agent, a defendant, a co-conspirator, or someone else, this court has repeatedly held that when statements come in for the effect on the listener, they're non-hearsay. Because given the context in which they come in, the veracity of the statements is completely irrelevant. What matters instead is that the statements were simply said. And that's exactly what happened here. With Mr. Rhodes' statements, the importance in the government's case in bringing those statements in was to show simply that those statements were said and that they were heard. And this is borne out in the record. If that's the purpose, to show that they were said and heard, why introduce the statements themselves? Couldn't you have just asked the detective, did Rhodes cooperate or did Rhodes testify? Your Honor, it was important to bring in the statements themselves to discuss the preliminary hearing as that was the precipitating event that led to Mr. Rhodes' murder. So it was important to bring in the statements themselves, not simply ask the detective about what Mr. Rhodes told her. And speaking of the detective and talking about her testimony, her testimony was very short and to the point. And as you said, Your Honor, she wasn't asked about the content of her testimony. Instead, she was shown this photograph. And this is the government's trial exhibit 113. And she was asked specifically with this photograph if she could identify these four individuals sitting in the back of the courtroom. And she identified those individuals as the defendant's friends and family. Special Agent Donovan got up after her and specifically identified those individuals as the defendant's mother and three other gang members, including his brother. So immediately after she's shown this photograph, the next question that the prosecutor asks her is, can you please authenticate the redacted transcript and the redacted audio from your testimony? And she simply says, yes, this is my testimony, and it's admitted. The only other question that she's asked after that is whether she later learned that Mr. Rhodes had been murdered. So as I said, Special Agent Donovan gets up next, and he continues that story. He explains his investigation into Mr. Rhodes' murder, and he explains, here's what happened after the preliminary hearing. The defendant then gets on the phone with the gang members who were in the courtroom that day and complains about Mr. Rhodes snitching. And this is what is the precipitating event. This preliminary hearing is the precipitating event that led to that phone call that then led to further discussions among gang members that then led to Mr. Rhodes' murder just two days later. And so the jury can understand from this context that these statements were only coming in for the effect on the listener. And now my opposing colleague mentioned the closing argument. The closing argument is consistent with this. The closing argument stated that these statements were only coming in for the effect on the listener, and the opening statement as well. And that closing argument, by the way, is document 630 at 117, if the court would like to reference it. The prosecutor made sure that the jury would understand these documents, these statements were only coming in for the effect on the listener. And even if it was possible that the jury did not understand this from the context and from the government's opening and closing statements, as was pointed out this morning, there was a limiting instruction given. Not once, but twice. And this is in the record, Your Honors, and it also should have been in our brief. This limiting instruction was given before the government finished its case in chief, and it was also given before the jury went back for deliberations. And that instruction was, very pointedly, to these statements that the jury could not consider them for their truth, but could only consider them for the effect they had on the defendant and the other gang members. I want to talk just very briefly about the Arbelias case, which was raised by my opposing colleague. This case is a distinctly different case from the cases before the court today. And in fact, it's a distinctly different case from the majority of the case law that this court has held on this subject. As was pointed out by Judge Brasher, what was really happening in that case was that the government was trying to bring in, effectively, the entire theory of the case, all of the evidence against this defendant with respect to all of the charges against him, through one agent's testimony, under the theory, or under the idea that this was coming in for the effect on the agent. This included multiple co-conspirator statements that directly implicated the defendant, and these statements were detailed in nature. And because of this, the jury couldn't separate. The jury could not look at those statements for anything except their truth. And that's just not what happened here. Our case is much more similar to Schley, Rivera, and Cruz. In each of those cases, what was happening was the government was admitting statements to show the effect that those statements had on the listeners, and in particular, to show how the defendant or how others responded when they heard those statements. And that's exactly what happened here. Mr. Rhodes' statements were coming in not just so that the government could show that they were heard, but then to continue that story and show what happened next. How did the defendant respond? How did the gang members respond? And they responded by putting into motion that plan to kill Mr. Rhodes. So for all of these reasons, Your Honors, the government submits that there was no error in this case in admitting these statements. And I'd like to just make one very brief argument, if I could, about harmless error. Even if this court were to find that there was error in this case, any error was certainly harmless. And that's because it's clear beyond a reasonable doubt that the statements, even if taken for their truth, would not have contributed to a guilty verdict in this case. And this court needs to look no further for this piece of analysis than the defendant's own testimony. So these statements, as we've mentioned, were very limited in nature. Judge Boulay redacted them. And because of those redactions, the only information that comes in through these statements, if taken for their truth, is that the defendant was at the scene of the shooting and that he arrived in the same vehicle with Mr. Rhodes. When the defendant was on the stand, he admitted both of those pieces of information. So because the defendant himself was bringing forth these facts, this evidence in his own testimony, these statements could not have possibly contributed to his guilty verdict. And beyond this, Your Honors, and this is laid out very clearly in our briefs, and extensively in our briefs, I should say, there is extensive evidence in this case, overwhelming, in fact, with respect to both the RICO conspiracy and the shooting. The shooting in particular, back to the defendant's own testimony, was evidence of his guilt. The defendant's story about how he ended up with the gun, but wasn't the shooter, was simply implausible. And the jury could take those false statements as evidence of his guilt. As I believe it was Judge Wilson mentioned, there were multiple people who testified that the defendant was the shooter. There were multiple people who testified that they saw him throw a firearm outside the vehicle. There were the defendant's fingerprints and DNA on the firearm. And there were shell casings from that same firearm found in the vehicle he was fleeing in. And this, of course, is not all of the evidence. That is just some of the evidence. But that evidence is sufficient on its own to find Mr. Kent, the defendant, guilty in this case. So for all of these reasons, Your Honors, we would ask that this Court affirm the decision of the District Court. Thank you. Thank you, Ms. Rupert. Mr. Haynes, you've reserved some time for rebuttal. Thank you, Your Honor. And I'll be brief. The government at trial continued this theme. And what was that theme? The theme was that Qalif Rhodes died because he implicated Maurice Kent, my client, in the shooting at the Club Medusa. That's what that, you know, even young children understand what the concept of snitching is. And so over and over and over again, through my client's Facebook posts, through co-defendants' testimony, it was mentioned over and over again. And not just snitching, but tied to that particular preliminary hearing, multiple defendants talked about Qalif Rhodes snitched at the preliminary hearing. Well, what's the preliminary hearing? The preliminary hearing is a probable cause determination on whether my client committed the shooting at the Club Medusa. That directly implicates my client. I thought of one other matter. And so I guess, and I get all that, but just because the facts are really, really bad for your client, that doesn't mean that, you know, there was a miscarriage of justice, right? I mean, well, once I just go back to my sort of original question, if the motive of the murder was the snitching, then the government's got to be able to prove the motive of the murder. And it seems like your argument is that the government just has to not prove the motive at all, even though the rules of evidence say that you can submit stuff like this for proof of motive. Well, I think that what I'm actually saying is that they can submit other evidence, and there's certainly other evidence in the record. But what they can't submit is a statement by somebody that I cannot cross examine. And that's why the Confrontation Clause is at play in this matter. The only other matter that I would bring the Court's attention to when the Court is doing the calculus in terms of the harmless error analysis is that the statement was played for the jury on a Thursday afternoon. The limiting instruction was not given until the following Monday. But isn't that because the lawyer for the defendant said, I don't want a limiting instruction? I remember Judge Goulet, I remember looking at the record, Judge Goulet said, I'll give you a limiting instruction if you want one. And the defendant's lawyer said, no, I think we'd rather preserve this issue for appeal. And then the defendant's lawyer changed his mind later. Well, I was that lawyer, and no. That's not what happened? That's not what happened. Oh, okay. What happened, and you're not far off, but what happened is that I said, I am not going to request a limiting instruction. The government had already requested one at that point in time. The judge decided he was going to give one and delayed giving it until we could get the language together, and that's why it was at that point in time. Thank you, Your Honor. All right. And thank you again, Mr. Haynes, for your service as court-appointed counsel for Mr. Kinn in this case. Do you have anything to add? Tomorrow? Are you going to be back tomorrow?